UNITED STATE DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

**GREGORY WASHINGTON**                    CIVIL ACTION NO:

            **Plaintiff**                 EXEMPT FROM FILING FEES
                                          UNDER 38 U.S.C. 4323(H)(1)

**VERSUS**                                SECTION:

**SHELL OIL COMPANY and**                 MAGISTRATE:
**METROPOLITAN LIFE**
**INSURANCE COMPANY**

            **Defendants**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CIVIL COMPLAINT

**COMES NOW,** the Plaintiff, GREGORY WASHINGTON, a person of the full age of

majority and domiciled in the Parish of Orleans, State of Louisiana, by and through undersigned

counsel, who in brings this action for Discrimination against persons who serve in the uniformed

services pursuant to 38 U.S.C. §4311(a) against made Defendants, Shell Oil Company (the

"Company") and Metropolitan Life Insurance Company ("MetLife"), action for liquated damages

pursuant to 38 U.S.C. §4323 for both MetLife and the Company's willful failure to comply with

the provisions of the Uniformed Services Employment Reemployment Act ("USERRA"),

a cause for rescission of an Agreement to Participate in a Special Severance Plan ("Agreement")

executed on December 1, 2016 pursuant to 38 U.S.C. § 4302(b), a cause for rescission of the

Agreement based on error and economic and financial duress, a cause for rescission of the Agreement because any alleged waiver of USERRA rights was not clear, convincing, specific, unequivocal and not in exchange for consideration that was more valuable than the USERRA rights Washington purportedly gave up, a state law claim of Intentional Infliction of Emotional Distress against MetLife for its intentional acts undertaken at the Company's behest in knowing violation of USERRA's protections extending to Washington's claim for benefits of employment in reckless disregard for harm MetLife intended its intentional acts to cause thereby.

## JURISDICTION AND VENUE

1. Plaintiff Greg Washington, "Washington" is a person of the full age of majority maintaining a domicile within this District.

2. Washington, a 2005 graduate from West Point, is an honorably discharged war veteran after having served on two tours of combat duty with the United States Army, the last tour being his deployment to Afghanistan from May of 2007 through March of 2008.

3. Congress enacted USERRA for three stated purposes: "(1) to encourage non career service in the uniformed services" by reducing employment disadvantages; "(2) to minimize the disruption to the lives of persons performing" military service, their employers and others "by providing for the prompt reemployment of such persons upon their completion of such service; and (3) t**o prohibit discrimination against persons because of their service in the uniformed services**." 38 U.S.C. § 4301(a).

4. 38 U.S.C. § 4311(a) provides that a service member "shall not be denied ... reemployment, retention in employment, ... or **any benefit of employment** " because of the person's military service.

5. That USERRA §4303(4)(A), 38 U.S.C. § 4303(4)(A), defines the term "**employer**" to include not only "any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities" but also those "to whom the employer has delegated the performance of employment-related responsibilities."

6. An **"employer"** violates the foregoing prohibition with respect to any benefit of employment when "membership, application for membership, **service,** application for service, or obligation for service in the uniformed services is a motivating factor" in an employment decision. § 4311(c)(1).

7. Named Defendant Shell Oil Company ("the Company") is a foreign corporation authorized to do and doing business in the State of Louisiana with its main office at 910 Louisiana Street, Houston, Texas 77002.

8. The Company established Shell Oil Company's Comprehensive Welfare Benefits Plan 801 ("The Plan") for the purpose of providing the **benefits** under and coordinating the administration of the Component Programs forming part of The Plan. The Company is the Plan Administrator for the Plan.

9. Shell Oil's Long Term Disability Plan ("Shell LTD Plan"), a Component Program of the Plan, provides insurance coverage designed to provide you with financial protection if you are unable to work for an extended period of time because of illness or injury.

10. Washington was employed by the Company as regular full time employee from May 1, 2012 through December 31, 2016, the Company is a private **"employer"** within the meaning of USERRA § 4303(4)(A), 38 U.S.C. § 4303(4)(A).

11. Washington gained access to and/or was eligible to participate in and in fact participated in both the Plan and Shell's LTD Plan by virtue of being employed as a regular full time employee

of the Company; disability benefits provided under Shell's LTD Plan constitute a term, condition, or privilege of employment, and are benefits of employment within the meaning of USERRA § 4303(2).

12. The Plan provides "[e]xcept as may otherwise be specifically provided in the applicable Component Program Document, in the case of any insured Component Program, the applicable Insurer is hereby delegated the powers and duties of the Plan Administrator, including, without limitation, the discretion to interpret the Plan provisions, with respect to such insured Component Program."

13. The Plan provides the "Plan administrator shall have full and absolute discretion to construe and interpret all provisions of the plan and Component Programs, including the discretion to resolve ambiguities, inconsistencies or omissions conclusively, provided however, that all such discretionary interpretations and decisions will be applied in a uniform and nondiscriminatory manner to all Participants, beneficiaries, and Covered Dependents who are similarly situated."

14. Metropolitan Life Insurance Company ("MetLife"), is a wholly owned subsidiary of Met Life, Inc., organized under the laws of a state other than Louisiana, authorized and registered to conduct business in the State of Louisiana.

15. In its capacity as Plan Administrator of both the Plan and Shell's LTD Plan, the Company delegated the authority, duty and responsibility of Plan Administrator with respect to Shell's LTD Plan to MetLife.

16. That MetLife's activities were not limited to the mere preparation and maintenance of plan benefit forms, that MetLife engaged substantive decision making regarding Shell's LTD Plan benefits, MetLife is considered an **employer** for purposes of USERRA. Uniformed Services

Employment and Reemployment Rights Act of 1994, As Amended [12/19/2005] citing S. Rep. No. 158, 103d Cong., 2d Sess. 42 (1993).

17. MetLife maintains a place of business within the geographic boundaries of this United States District Court at 3838 North Causeway Blvd. Ste. 3400, Metairie, LA 70002.

18. The Federal Court for the Eastern District of Louisiana has personal jurisdiction over the parties and subject matter jurisdiction over Washington's USERRA claims alleged herein pursuant to 38 U.S.C. § 4323(b), 28 U.S.C. § 1331.

19. Venue is proper within this District Court pursuant to 38 U.S.C. § 4323(c)(1) because both the Company and MetLife maintain a place of business within the Eastern District.

20. USERRA has no statute of limitations. *See* 38 U.S.C. § 4327(b); 20 C.F.R. § 1002.31116.

## BACKGROUND

21. Washington was employed with and assigned to the Company's "Material Management" unit created to assist management in accounting for and efficiently managing all its materials inventory, accounting for equipment purchased and/or consumed on the project, disposing of the excess material as well as setting up a maintenance and reorder plan.

22. Due to a lack of upper management direction, "Material Leads" working in that unit were faced with resistance from project managers that had been working at Shell for 10 to 15 plus. Ongoing clashes between "Material Leads" and project managers caused for a stressful work environment.

23. Acknowledging  the stressful work environment, the Manager of the unit routinely held team building exercises directed to getting unit members to work together and support each other in a unified effort.

24. Through these team building exercises Washington developed a working relationship with who one of the other Warehouse Managers, Susan McElroy ("McElroy").

25. As can be expected with the team building exercises, McElroy shared some of her professional experiences and aspirations; Washington in turn shared what it was like to serve in armed forces, what it was like to be in lead a company of men and some of the things he did while in Afghanistan; shared stories about how we would use a bright flashlight to breach an entry point and clear a room.

26. Washington's positive working relationship with McElroy aside, an incident arose when one of McElroy's contractor working in Washington's area indicated McElroy had not provided her with much needed guidance as to what to do. Washington provided the same, the contractor returned the next day to thank Washington for his assistance.

27. Learning of Washington's encounter with her contractor, McElroy approached Washington the very next day demanding she and he meet in the Manager's office to discuss the situation.

28. Immediately upon entering the Manager's office, McElroy began yelling and screaming at the top of her lungs towards Washington that the contractor to whom Washington gave guidance worked for her.

29. The Manager asked McElroy to calm down, she didn't, she just kept ranting "do you hear me." Washington didn't understand why she was so angry; Washington's only response was he was only trying to help.

30. McElroy slammed her hand against the table, repeated herself over and over, then pointed her finger towards Washington's face in a threatening manner. Recognizing the Manager could not control McElroy and/or the situation, Washington looked at the Manager, looked at McElroy, exited the Manager's office without saying a word.

31. An already stressful work environment became all the more stressful for Washington in the days and weeks to follow as result of the incident.

32. Washington knew his co workers overheard McElroy's disrespectful outburst directed at him; knew his co workers were aware management did nothing to redress McElroy's behavior. Washington felt humiliated in the eyes of his peers.

33. The fact management did nothing to redress McElroy's behavior, the fact Washington did not respond in like fashion to McElroy's disrespectful behavior, served only to heighten the angst Washington felt following the incident.

34. Less than a week after the incident, the Manager called a meeting with all of the Material Leads under his supervision in his office.

35. On his way to the meeting, Washington observed McElroy and three other Material Leads conversing on an adjacent office prior to the scheduled time of the meeting.

36. Washington was the first to arrive in the Manager's office for the meeting.

37. While waiting for the Manager to arrive and the meeting to start, McElroy rushed into the Manager's office with one fist up, holding a flashlight her other hand and proceeds to shine the light directly into Washington's face and eyes much in the same way Washington told McElroy he would do when clearing a room in Afghanistan.

38. Flashbacks of Washington's tour of duty in Afghanistan and all that accompanied his experiences there  were instantaneous.

39. Washington sat dazed through the meeting dazed, feeling threatened and angry for not defending himself.

40. At the conclusion of the meeting, Washington went back to his office and wrote his Manager an email detailing what happened before the meeting started. The Manager walked into

Washington's office within minutes, of receiving the e-mail, apologized for McElroy's actions, cautioned Washington that he need not send anymore emails detailing the incident as he would take care of it.

41. The Manager did nothing to mitigate or resolve the matter.

42. Washington sustained a Traumatic brain injury (TBI) during his tour of duty in Afghanistan post being hit by a grenade during a skirmish more than four years prior becoming employed by the Company.

43. Washington's pre-employment physical four years later was unremarkable.

44. More than five years after his combat tour of duty in Afghanistan, more than one year after commencing his employment with Shell, Washington was diagnosed as suffering from PTSD in December 3, 2013.

45. A primary component of the symptomatology of PTSD is the re experiencing or reliving of the traumatic memory, that has both elements of psychophysiological reactivation and psychological distress. The repeated reactivation of the traumatic memory and the associated stress response with the attendant risk of the progressive augmentation of the reactivity of the individual is a unique part of this condition.

46. Washington's stressful work environment steadily and progressively provided a ready source of repeated or extreme indirect exposure to aversive details of the event(s) in the course of his professional duties; caused Washington to exhibit marked physiologic reactivity after being exposed to trauma-related stimuli [McElroy's outburst in Faustino's office and/or McElroy's shining the flashlight into his eyes]; caused Washington to experience trauma-related thoughts or feelings post McElroy's outburst in the Manager's office and/or McElroy's shining the flashlight into his eyes; caused Washington to experience persistent distorted blame of self or others for

causing the traumatic event and/or his having failed to respond in like fashion to McElroy's disrespectful behavior; caused Washington to feel alienated from others post McElroy's outburst in Faustino's office and/or McElroy's shining the flashlight into his eyes because management did nothing to redress McElroy's behavior; caused Washington to experience, difficulty concentrating at work and symptoms related distress or functional impairment post the two incidents which ultimately precluded Washington from working.

47. Though McElroy apologized years later,



the damage had already been done.

48. Washington filed a claim for Short Term Disability effective **October 13, 2014** asserting his diagnosis for post traumatic stress disorder ("PTSD"), depression, anxiety/panic attacks, migraines headaches, back pain with radiation into the right arm and leg, ulnar neuritis, right

elbow epicondylitis, eidymal cysts and small varioceles bilaterally, right sided upper extremity pain temporomandibular joint disorder, sinus problems, insomnia, continuously supported physical or psychiatric restrictions or limitations which would have prevented Washington from performing his regular job or a Comparable Occupation from October 13, 2014.

## RELEVANT PROVISIONS OF SHELL'S LTD PLAN

49. Shell's LTD Plan states:

"This Plan does not provide benefits for any Disability that is caused by, contributed to by, or resulting from a Pre-Existing Condition, unless the Disability begins after the first of these events takes place:

**1.** you have received no Medical Advice or Treatment for the condition for 3 consecutive months. This 3 month period must end while you are covered under This Plan.

. **2.** you have been covered under This Plan for 12 months in a row."

**However, the "Pre-Existing Condition Limitation - Only applies: (1) to Employees who enrolled for insurance under This Plan on January 1, 2003; and (2) who were not participating in a Shell Oil or former alliance Long Term Disability Plan prior to January 1, 2003."**

50. Shell's LTD Plan states:

"Disability" or "Disabilities" means that, due to an Injury or Sickness, you require the regular care and attendance of a Doctor and meet either 1. or 2. below:

1. a.  During the Elimination Period and the 24 month period immediately following the Elimination Period, you are unable to perform each of the material duties of your regular job or a Comparable Occupation with the Employer which the Employer will have offered to such Employee provided a Comparable Occupation is available.

51. Shell LTD Plan states as follows:

"This Plan does not cover any Disability which results from or is caused or contributed to by:

    1. **war, insurrection, or rebellion;**
    2. active participation in a riot;
    3. intentionally self-inflicted injuries or attempted suicide;
    4. the commission or attempted commission of a felony or otherwise serious crime or assault;
    5. **service in the armed forces of any nation**;
    6. any Injury or Sickness that you sustain while you are on disciplinary leave or absent without leave; or
    7. your failure to follow the instructions of your Doctor.

### METLIFE'S CLAIMS LEVEL DENIAL OF WASHINGTON'S CLAIM

52.  MetLife approved and paid Washington Short Term disability benefits under Shell's LTD Plan from October 13, 2014 through June 30, 2015.

53.  MetLife denied Washington's claim for Long Term Disability benefits by letter dated **December 9, 2015** stating:

> The behavioral health intake on August 4, 2015 with Dr. John Bradley noted that you were diagnosed with PTSD on December 3, 2013. **Based on review of the behavioral health evaluation the PTSD is war related as most or all of your trauma relates to (OEF) . . . Although medicals supports for the PTSD and depression these conditions are noted to be war related and are subject to the war exclusion in the plan.**

> **In summary, while we acknowledge that your depression and PTSD conditions are disabling they are war related as most or all of your trauma relates to your past deployments during OEF while in service in the armed forces. Medical records related to your complaint of migraines show they are likely related to the traumatic brain injury sustained while deployed during OEF and are controlled with medication and so are not disabling.** A MetLife Medical Director reviewed the claim **for the physical conditions of right elbow epicondylitis and ulnar neuritis and found the** medical does not support beyond June 30, 2015. The Medical Director opined that based on the last medical record on file for these conditions, dated for April 29, 2015 and without evidence of nerve root or spinal cord compromise or evidence of radiculopathy the medical information on file supported functional limitations precluding you from using your right arm through June 30, 2015. This was approximately 8 weeks from your last evaluation on file to allow for further evaluations and treatment. He also opined that the condition is likely war related and was worsened by working. **Therefore, your claim is denied effective October 13, 2015 as the medical information received**

**and reviewed does not support the definition of disability throughout the entire elimination period and is war related and considered an exclusion according to the Plan.**

### WASHINGTON'S FIRST APPEAL

54. Washington timely appealed MetLife's initial denial of his claim.

55. Washington's claim file on appeal included an Attending Physician Statement dated February 4, 2015 evidencing Washington was unable to work due to the PTSD, chronic migraines, hypertension, cubital tunnel syndrome, back and chest pain as of that date.

56. The "Elimination Period" before which Long Term Disability Benefits become payable under the Shell's LTD Plan is 52 weeks; the elimination period for Washington's claim for Long Term Disability Benefits ran from October 13, 2014 to October 13, 2015.

57. Washington's claim file on appeal includes a Psychiatric Clinical Specialist Assessment performed at Met Life's request dated October 25, 2015 establishing Washington's psychiatric impairments, PTSD and depression, continuously prevented Washington from performing his regular job or a Comparable Occupation from October 13, 2014 throughout the Plan's Elimination Period.

58. During the pendency of his initial appeal, Washington sent not less than six separate letter each providing MetLife written notice that:

    1. The provision of the Plan stating "This Plan does not cover any Disability which result from or is caused or contributed by: 1. war, insurrection, or rebellion . . . " had no application to Washington's claim for benefits. History reflects that during the time Washington spent in Afghanistan, there was no properly declared or "perfect" war between the United States and the Afghan Government; reflects the United States military forces were present in Afghanistan by the consent and desire of Afghanistan's properly elected and representative government. War, both declared and undeclared, requires a conflict between two nations. War cannot exist between mere individuals. That a "war" did not exist in any form between Afghanistan and the United States during Mr. Washington's time in Afghanistan from May 2007 through March 2008, any disability alleged to result from or be caused or contributed to by Mr. Washington's time in Afghanistan from May 2007 through March 2008 would not constitute a disability otherwise excluded under the Plan.

2. Since a war, as the term is used in Shell's LTD Plan, did not exist in any form between Afghanistan and the United States during Washington's time in Afghanistan, any disabling conditions MetLife alleges to result from, be caused or contributed to by Washington's traumatic brain injury sustained while in Afghanistan are not otherwise excluded by the "war" exclusion under the Plan.

3. Even could the "war" exclusion be applied to exclude any disabling condition alleged to result from Washington's traumatic brain injury sustained while in Afghanistan, TBI and PTSD are separate conditions. Washington maintained that since the current manifestation of Washington's disabling condition (PTSD) was proximately caused by job related stress, Washington's acknowledged disabling condition (PTSD) is not otherwise excluded under the "war" exclusion of the Disability Plan. **(Exhibit A).**

59. Washington also maintained on appeal during the pendency of the appeal that since covered benefits extend under Shell's LTD Plan to similarly situated nonmilitary employee's claim for benefits arising from the exact same disabling conditions, delayed onset of PTSD, triggered by material changes in the work environment, deemed caused by, contributed to or resulting from a non service related Pre-Existing Condition irrespective of the type of underlying Pre-Existing injury and/or the resultant disabling condition, any denial of Washington's entitlement to benefits, extending to similarly situated nonmilitary employee, motivated by Washington's service in the armed forces violated USERRA's protections extending to Washington's benefits of employment sought under Shell's LTD Plan.

60. Washington specifically showed on appeal that because Washington is/was not an (1) Employee who was enrolled for insurance under this Plan on January 1, 2003 who was not participating in a Shell Oil or former alliance Long Term Disability Plan prior to January 1, 2000, Pre Existing Conditions provisions of Shell's LTD Plan ("Pre Existing Conditions provisions") extended covered benefits to Washington arising from **any Disability,** not otherwise excluded under Shell's LTD Plan, sustained caused by, contributed to by, or resulting from a Pre-Existing Condition.

61. Washington showed on appeal that Pre Existing Conditions provisions extended covered benefits to military and nonmilitary employees alike arising from **any Disability,** not otherwise excluded under Shell's LTD Plan, sustained caused by, contributed to by, or resulting from a Pre-Existing Condition.

62. Pre Existing Conditions provisions extended covered ***benefits*** to a similarly situated nonmilitary employee arising from a claim for benefits for Washington's same disabling conditions, delayed onset of disabling PTSD conditions triggered by material changes in the work environment, MetLife deemed to have been be caused by, contributed to or resulting from Pre-Existing Condition, i.e., blunt force trauma sustained in an automobile accident seven years earlier while not in the armed services.

63. Since covered benefits extended under Shell's LTD Plan to similarly situated nonmilitary employee arising from **any Disability,** not otherwise excluded under Shell's LTD Plan, deemed to result from or be caused or contributed to a Pre Existing Condition occurring while not in the armed services, covered benefits extend to similarly situated nonmilitary employee under Pre-Existing Condition provisions irrespective of the nature of the resultant disabling condition and/or the nature of the underlying Pre-Existing injury.

64. Washington argued since Pre Existing Conditions provisions extend covered ***benefit*** to military and nonmilitary employees alike arising from **any Disability,** not otherwise excluded under Shell's LTD Plan, caused by, contributed to by or resulting from a Pre-Existing Conditions irrespective of the nature of the resultant disabling condition and/or the nature of the underlying Pre-Existing injury, MetLife based its denial of Washington's claim not on the nature [blunt force trauma to the head] of the underlying Pre-Existing Condition sustained nor the resultant [PTSD]

disabling condition manifesting itself seven years later, <u>but rather based solely on Washington's alleged status at the time the underlying trauma is alleged to have been sustained</u>.

65. That USERRA's protections afforded Washington a protected federal right not to be denied ***benefits of employment*** extending to similarly situated nonmilitary employees under Shell's LTD Plan based on Washington's service in the armed forces, that Pre Existing Conditions provisions extend covered ***benefits*** to military and nonmilitary employees alike arising from **any Disability,** not otherwise excluded under Shell's LTD Plan, caused by, contributed to by or resulting from a Pre-Existing Condition irrespective of the nature of the resultant disabling condition and/or the nature of the underlying Pre-Existing injury, Washington argued on appeal any application of Shell's Armed Services Exclusion caused Washington's Pre-Existing Condition to be treated less favorably than a similarly situated non-military employee's Pre-Existing Condition.

**METLIFE'S DENIAL OF WASHINGTON'S INITIAL APPEAL**

66. By letter dated September 9, 2016 "(Denial Letter"), MetLife upheld its own initial "claims level denial" of Washington's claim for Short Term benefits from July 1, 2015 through October 1, 2015 arising from disability due to Washington's physical injuries asserting these conditions were not disabling past June 30, 2015; MetLife upheld denial of Washington's claim for Short Term disability benefits from July 1, 2015 through October 1, 2015 arising from Washington's disabling PTSD/depression conditions based on the "plan exclusion for service in the armed forces of any nation, **which was not a basis for the original determination,"** MetLife upheld denial of Washington's claim for Long Term disability benefits effective October 13, 2015 arising from Washington's disabling PTSD/depression conditions based on the "plan exclusion for service in the armed forces of any nation, **which was not a basis for the original determination."**

67. MetLife's Denial Letter stated "[b]ecause MetLife's claim determination on appeal is based in part upon the plan's exclusion for service in the armed forces of any nation, which was not a basis for the original claim determination we are providing additional appeal rights with respect to those conditions subject to that exclusion as follows; [b]ecause Mr. Washington's claim was denied in whole or in part he may appeal this decision made regarding his psychiatric conditions with regard to the Plan's **war or service in the armed forces of any nation exclusions** by sending a written request for appeal to MetLife."

68. That the Denial Letter states MetLife's claim determination on appeal is "based in part upon the plan exclusion for service in the armed forces of any nation, **which was not a basis for the original determination,"** MetLife's initial "claims level denial rested solely on its application of the war exclusion. Had MetLife upheld its initial "claims level denial" on September 9, 2016 based on its application of claim of the war exclusion. MetLife knew Washington would have already exhausted his appeal rights with respect to his disabling conditions, PTSD/depression, made subject to the war exclusion at the claims level, there would have been no basis to invite Washington to file another appeal of MetLife's application of the war exclusion. MetLife also knew any such decision upholding its own "claims level denial" based on its application of the war exclusion would not hold up on judicial appeal.

69. Thus, MetLife engaged in a bit of sleight of hand purportedly affording Washington the right appeal its decision made regarding his psychiatric conditions with regard to the Plan's war or service in the armed forces of any nation exclusions to question the existence of a cause under USERRA arising from MetLife's denial of his claim misleading Washington into believing MetLife's denial of its claim on September 9, 2016 could have been based in part on its application of the war exclusion. MetLife's trickery was confirmed several months later in its

Second Denial Letter when on May 1, 2017 declared what MetLife knew on September 9, 2016, "**MetLife in denying Mr. Washington's claim is no longer relying in any way on the Plan's exclusion for disabilities that result from or are caused or contributed to by "war, insurrection, or rebellion ...** "

70. MetLife knew on or before September 9, 2016 but did not disclose its application of the war exclusion in denying Washington's claim for benefits through September 9, 2016 was wrongful, knew on or before September 9, 2016 Washington was otherwise entitled to no less than $68,000.00 in benefits arising from July 1, 2015 through September 9. 2016 as result of its wrongful application of the war exclusion but did not disclose that fact.

71. MetLife continued its denial of Washington's claim for benefits upholding its claims level denial of Washington's claim for benefits arising from psychiatric disabling conditions based solely on its application of Shell's Armed Service Exclusion, "which [exclusion] was not a basis for the original determination," failing provide in response to Washington's substantive arguments advanced in six separate letters sent to MetLife during the pendency of the appeal specific reasons for its adverse determination.

72. MetLife continued its wrongful denial of Washington's claim for benefits upholding its claims level denial premised solely on its application of Shell's Armed Service Exclusion, "which [exclusion] was not a basis for the original determination," ignoring its statutory obligation to modify Shell's LTD Plan in order that Washington could avail himself of USERRA's protections extending to his claim under the Plan, refusing to use the unfettered power as an employer for purposes of USERRA delegated to it by the Company to modify Shell's LTD Plan adopted in order that the Company could comply with its own non-delegable requirements under USERRA.

73. Washington timely appealed MetLife's denial with respect his disabling PTSD/depression conditions made subject to Shell's Armed Services Exclusion of September 9, 2016 advancing the same arguments advanced with its initial appeal, specifically, any application of Shell's Armed Service Exclusion in denying Washington LTD benefit claim would in effect serve to deny Washington's entitlement to benefits, extending to similarly situated nonmilitary employee, solely on Washington's service in the armed forces in violation of USERRA. (Exhibit B).

## WASHINGTON'S SECOND APPEAL

74. During the pendency of the second appeal, MetLife caused an Independent Physician Consultant File Review of Washington's claim file to be conducted by Marcus Goldman, M.D. The report generated there from stated in part that "[r]ecords from the VA dearly identify the claimant was a combat veteran who fully meets criteria for PTSD, as is noted in a comprehensive assessment from August 4, 2015, as a result of service in the armed forces. "

75. Dr. Goldman's report states PTSD symptoms can be dormant for years, only to be activated by a stressful life event; states "Washington's disabling PTSD conditions could have been "triggered by an event in the workplace causing significant PTSD symptoms, reminiscent of his experiences when deployed." PTSD symptoms can be dormant for years, only to be activated by a stressful life event." Consistent with Washington's position advanced on appeal, Dr. Goldman's report confirms the current manifestation of Washington's disabling conditions, PTSD and depression, could have been proximately caused by job related stress.

76. Dr. Goldman's report however fails to contain any medical opinion contrary to the medical opinion Washington's psychiatric impairments, PTSD and depression, continuously prevented Washington from performing his regular job or a Comparable Occupation from October 13, 2014 throughout the Plan's Elimination Period contained in the Psychiatric Clinical Specialist (PCS)

Assessment performed at Met Life's request dated October 25, 2015 made part of Washington's claim file on appeal.

77. But for MetLife's acknowledged wrongful application of the war exclusion on or before September 9, 2016, MetLife's application of Shell's Armed Services Exclusion in denying Washington's claim benefits of employment under Shell's LTD Plan on September 9, 2016 in violation of USERRA's protections extending thereto, the date MetLife responded to the econd appeal, May 1, 2017, Washington's claim file included "Objective Medical Findings, the Psychiatric Clinical Specialist (PCS) Assessment performed at Met Life's request dated October 25, 2015, establishing Washington's psychiatric impairments, PTSD and depression, continuously prevented Washington from performing his regular job or a Comparable Occupation from October 13, 2014 throughout the Elimination Period and beyond.

## FIRST CAUSE OF ACTION FOR VIOLATION OF
## 38 U.S.C. §4311(c)(1) - DISCRIMINATION.

78.  Washington incorporates each of the above paragraphs by reference herein.

79.  USERRA provides a "*person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or* **any benefit of employment** *by an* **employer** *on the basis of that membership, application for membership, performance of service, application for service, or obligation*." 38 U.S.C. §4311(a).

80.  A 2005 graduate from West Point and having served on two combat tours of duty, one of which was his deployment to Afghanistan from May of 2007 through March of 2008 with the United States Army as a Special Forces Officer, Washington is an honorably discharged war veteran.

81. Washington was a regular full time employee employed by the Company from May 1, 2012 through December 1, 2016. The Company, Washington's employer from May 1, 2012 through December 1, 2016, is "**an employer**" within the meaning of and for purposes of 38 U.S.C. § 4303(4)(A).

82. Washington gained access to and/or was eligible to participate in the Plan and Shell's LTD Plan by virtue of his employment as a regular full time employee with the Company, Shell's LTD Plan provides income replacement as a benefit to their employees in the event that their employees cannot work because of a disability, LTD Benefits provided under Shell's LTD Plan constitute a term, condition, or privilege of employment, and are a benefit of employment within the meaning of USERRA § 4303(2).

83.  Shell's LTD Plan is underwritten by and funded with a LTD Plan adopted by MetLife; the Plan provides the applicable Insurer is delegated powers and duties of the Plan Administrator.

84.  Section 10.5 of the Plan, Delegation by Plan Administrator provides in relevant part:

(a) Delegation. The Plan Administrator may delegate any of its powers, duties, and responsibilities with respect to the operation and administration of the Plan including the administration of claims, the authority to authorize payment of benefits, the review of denied or modified claims, and the discretion to decide matters of fact and to interpret Plan provisions. The Plan Administrator also may employ, and authorize any of its delegates to employ, persons to render advice regarding any fiduciary responsibility hereunder. All delegations will be terminable by the Plan Administrator upon such notice as it deems appropriate. Except as may otherwise be specifically provided in the applicable Component Program Document, in the case of any insured Component Program, the applicable Insurer is hereby delegated the powers and duties of the Plan Administrator, including, without limitation, the discretion to interpret the Plan provisions with respect to such insured Component Program. Delegations of authority may include, but not be limited to, the following: . . .

**(viii) To determine all questions concerning eligibility for benefits which determination will be conclusive and binding on all parties. . . .**

(b) Liability and Indemnification. **Upon designation and acceptance of such delegation, employment, or authorization, the Plan Administrator will have no liability for the acts or omissions of any such designee as long as the Plan**

**Administrator does not violate its fiduciary responsibility in making or continuing such designation.**

85. A person is considered an ERISA **Fiduciary** to the extent (i) **he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,** (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) **he has any discretionary authority or discretionary responsibility in the administration of such plan**."

86. Claiming it is an ERISA Claim Fiduciary, MetLife necessarily claims the Company, in accordance with provisions in the Plan, delegated its authority, duty and responsibility as Plan Administrator with respect to the operations of Shell's LTD Plan to MetLife including the administration of claims, the authority to authorize payment of benefits, the review of denied or modified claims, and the discretion to decide matters of fact and to interpret Plan provisions and the right to **"determine all questions concerning eligibility for benefits which determination will be conclusive and binding on all parties."**

87. 29 U29 U.S. Code § 1104 provides ". . . a **fiduciary** shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and— (A) for the exclusive purpose of: (i)   providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; . . . and (D) **in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and  subchapter III.**

88. The term "**employer**" is defined to include not only "any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment

opportunities" but also those "to whom the employer has delegated the performance of employment-related responsibilities." 38 U.S.C. §4303(4)(A).

89. That MetLife's activities were not limited to the mere preparation and maintenance of plan benefit forms, that MetLife engaged substantive decision making regarding Shell's LTD Plan benefits, MetLife is considered an **employer** within the meaning of USERRA § 4303(4)(A), 38 U.S.C. § 4303(4)(A). Uniformed Services Employment and Reemployment Rights Act of 1994, As Amended [12/19/2005] citing S. Rep. No. 158, 103d Cong., 2d Sess. 42 (1993).

90. An **employer** shall be considered to have engaged in actions prohibited—

      (1) under subsection (a), if the person's . . . service , , , in the uniformed services is a **motivating factor** in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service; 38 U.S.C. § 4311(b).

91. "[M]ilitary service is a [substantial or] motivating factor for an adverse employment action if the employer relied on, took into account, considered, or conditioned its decision on the employee's military-related absence or obligation." *__McMillan v. Dep't of Justice__*, 812 F.3d 1364, 1372 (Fed. Cir. 2016) (internal quotation marks and citation omitted)."

92. The factual question of discriminatory motivation or intent may be proven by either direct or circumstantial evidence. Absent direct evidence, the Court may infer discriminatory motivation from, inter alia, such factors including, ". . . [(2)] **inconsistencies between the proffered reason and other actions of the employer**, . . . and (4)] **disparate treatment of certain employees compared to other employees [with similarly situated claims.**]. *__Sheehan v. Dep't of the Navy,__* 240 F.3d 1009, 1012, 1014 (Fed. Cir. 2001)

93. MetLife's response dated May 1, 2017 to Washington's second appeal ("Second Denial Letter") confirmed what MetLife knew on September 9, 2016; specifically, MetLife wrongfully

applied the war exclusion in denying Washington's claim arising from Washington's psychiatric disabling conditions for Short and Long Term benefits from July 1, 2015 through September 1, 2016, MetLife continued its wrongful denial of Washington's claim for benefits on September 9, 2016 based solely on its application of a plan exclusion for service in the armed forces of any nation, **which was not a basis for the original determination.**

94. The Second Denial Letter states denial of Washington's claim arising from psychiatric disabling conditions was "*based upon the Plan's entirely separate and independent exclusion for disabilities that result from or are caused or contributed to by service in the armed forces of any nation"* which states *"[t]is Plan does not cover any Disability which results from or is caused or contributed to by:. . . 5. service in the armed forces of any nation.*" ("Shell's Armed Services Exclusion"). By MetLife's own admission, MetLife establishes Washington's military status was the **motivating factor** [MetLife] relied on, [took] into account, considered, or conditioned its decision to deny Washington's claim for benefits of employment.

95. Responding to the seven or so letters Washington sent during the appeals process putting MetLife on notice any application of Shell's Armed Service Exclusion in denying Washington LTD benefit claim violated USERRA's protections extending to Washington's claim, the Second Denial Letter offered an intentional misstatement of unassailable fact that "*USERRA has no applicability here. The relevant employment benefit here is LTD* **coverage."**

96. USERRA defines the term "benefit", "benefit of employment",  or "*rights and benefits" to mean terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or interest . . .* **that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice** *and* **includes rights and benefits under a**

*pension plan, a health plan, an employee stock ownership plan, insurance coverage . . .*" Washington paid for and thus sought benefits provided under Shell's LTD Plan.

97. The Company's Plan unambiguously defines the term "*coverage*" to mean "*[t]he benefits provided under the Plan as specifically described in* [the a Component Program forming part of the Plan]. Shell's LTD Plan is a Component part of the Company's Plan. A preeminent underwriter of Welfare Benefit Plans and/or Claims Administrator of Long Term Disability Plans established by national and multinational companies, MetLife clearly knew USERRA's protections extends to reach the *benefits* provided under Shell's LTD Plan and/or USERRA's protections extend to reach Washington's claim for benefits under Shell's LTD Plan.

98. Acknowledging its application Shell's Armed Service Exclusion in denying Washington LTD benefit claim, the Second Denial Letter next claimed because "*Mr. Washington received the same LTD coverage as other Shell Oil employees. . . . All Plan participants, both armed forces service members and non-armed forces service members, have received the same coverage,*" Washington was really "*being denied benefits, because the Plan does not provide disability benefits for his claimed disabling conditions.*".

99. The issue under USERRA is not whether, based on MetLife's application Shell's Armed Services Exclusion, the Plan does not provide disability benefits for Washington's claimed disabling conditions, but whether MetLife would have indeed denied disability benefits under the Plan for Washington's claimed disabling conditions regardless of MetLife's application Shell's Armed Services Exclusion or Washington's military status. *Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.,* 473 F.3d 11, 20  (1st Cir. 2007).

100. While application of Shell's Armed Services Exclusion may be a basis upon which to deny Washington's claim under the Plan, that is only the beginning of the analysis. MetLife need go

further and demonstrate, by a preponderance of the evidence, it *would* indeed have denied Washington's claim for benefits, regardless of his military status. ***Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.,*** 473 F.3d 11, 20  (1st Cir. 2007).

101. MetLife knew Pre Existing Conditions provisions of Shell's LTD Plan extend covered ***benefits*** to **military** and **nonmilitary** employees alike arising from **any Disability,** not otherwise excluded under Shell's LTD Plan, caused by, contributed to by or resulting from a Pre-Existing Condition; Pre Existing Conditions provisions extend covered ***benefits*** to a similarly situated **nonmilitary employee's** claim for benefits arising from Washington's exact same disabling condition, delayed onset of disabling PTSD conditions triggered by material changes in the work environment, deemed to have been be caused by, contributed to or resulting from Pre-Existing Condition, i.e., deemed to have been be caused by, contributed to or resulting from blunt force trauma sustained in an automobile accident while not in the armed services seven years earlier, irrespective of the type of underlying Pre-Existing injury and/or the resultant disabling condition.

102. MetLife knew as applied in this instance Shell's Armed Services Exclusion served to change coverage extending under Pre Existing Conditions provisions with respect to disabling conditions deemed caused by, contributed to by or resulting from Pre-Existing Conditions from one that treats **members of the military** the same as **similarly situated non-military employees** to one that treats a **member of the military's** disabling conditions arising from Pre-Existing Conditions considerably less favorably than that of a **similarly situated non military's employee's** disabling conditions of arising from Pre-Existing Conditions. ***Bello v. Village of Skokie***, No. 14 C 1718 (N.D. Ill. Sept. 2, 2014).

103. While MetLife establishes, by its own admission, Washington's military status was the motivating factor in the adverse determination reached, the Court may also infer discriminatory

motivation in this instance from the "disparate treatment of certain employees compared to other employees [with similarly situated claims]" occasioned when MetLife's applied Shell's Armed Services Exclusion in denying Washington's claim for benefits. *Sheehan v. Dep't of the Navy,* 240 F.3d 1009, 1012, 1014 (Fed. Cir. 2001)

104. Well aware Pre Existing Condition provisions exposed the discriminatory impact of its application of Shell's Armed Services Exclusion in denying Washington's claim, MetLife claimed it had "***not denied or upheld the denial of Mr. Washington's claim based upon the Plan's Pre-Existing condition [provisions] and has not relied and does not rely in any way upon that Plan provision. Any discussion of the Plan's pre-existing condition [provisions] is not relevant the adjudication of Mr. Washington's claim.***"

105. Finally, MetLife proffered two purely pretextual reasons presumably in support of a knowingly false assertion it would have denied Washington's claim for benefits in spite of its application Shell's Armed Services Exclusion or Washington's military status.

106. Tacitly acknowledging USERRA's protections extending to Washington's claim for benefits under the LTD Plan, Pre-Existing Condition extend covered benefits to similarly situated non military's employee's notwithstanding, MetLife claimed that as an ERISA Claim Fiduciary, MetLife nonetheless had a duty to administer the LTD Plan in accordance with express written provisions of the LTD Plan, claimed MetLife's duty to apply Shell's Armed Services Exclusion in accordance with express written provisions contained in the LTD Plan superseded MetLife's duty, as an employer for purposes of USERRA, to substitute USERRA's substantive protections in place of provisions in Shell's LTD Plan applied in effect to "replace, limit, or eliminate" Washington's protected federal right not to be denied benefits extending under the  LTD Plan to

similarly situated nonmilitary employee based on Washington's performance of service in the armed forces.

107. USERRA is a federal statute not preempted by ERISA. See 29 U.S.C. § 1144(d)("Nothing in this [ERISA] subchapter [on the Protection of Employee Benefit Rights] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections [addressing federal laws other than USERRA].. . . "). ***Shea v. IRON WORKERS DIST. COUNCIL OF NEW ENGLAND***, 158 F. Supp. 3d 20 (D. Mass. 2016);

108. USERRA's protections "**supersedes any** State law (including any local law or ordinance), **contract, agreement**, policy, plan, practice, or other matter **that reduces, limits, or eliminates in any manner any right** or benefit provided by this chapter, **including the establishment of additional prerequisites to the exercise of any such right or the receipt of any such benefit**." 38 U.S.C. § 4302(b).

109. USERRA's legislative history makes clear Congress intended the definition of "**employer**" [be interpreted broadly] enough to apply to insurance companies [**like MetLife**] that administer employers' life, long-term disability, or health plans, **so that such entities [like MetLife] cannot refuse to modify their policies in order for employers to comply with requirements under [USERRA].**" S. Rep. No. 158, 103d Cong., 2d Sess. 42 (1993).

110. An employer for purposes of USERRA, MetLife knew full well it bore a statutory obligation to substitute USERRA's substantive protections in place of provisions in Shell's LTD Plan applied in effect to "replace, limit, or eliminate" Washington's protected federal right not to be denied disability benefits extending under Shell's LTD Plan to similarly situated nonmilitary employee based on Washington's performance of service in the armed forces. ***Bodine v. Cook's Pest Control, Inc.*** 830 F.3d 1320 (11th Cir. 2016); 38 U.S.C. § 4302(b).

111. MetLife's adherence to its alleged duty as an ERISA Claims Fiduciary to administrator the Plan in accordance with express written provisions meant MetLife application of the express provisions of Shell's Armed Services Exclusion in denying Washington's claim served to deny Washington's entitlement to covered benefits extending to a similarly situated nonmilitary employee under the Plan based on Washington's service in the armed forces in violation of USSERA protections extending thereto. MetLife's alleged adherence to its duty as an ERISA Claims Fiduciary in applying express written provisions of Shell's Armed Services Exclusion in accordance with the Plan is inconsistent with USERRA protections extending to Washington's claim, far more restrictive than USERRA protections extending to Washington's claim for benefits of employment and thus preempted by USERRA. *__Shea v. IRON WORKERS DIST. COUNCIL OF NEW ENGLAND__*, 158 F. Supp. 3d 20 (D. Mass. 2016).

112. USERRA is a federal statute not preempted by ERISA, USERRA precludes laws or policies that diminish rights there under. Washington's protected federal right not to be denied *__benefits of employment__* based on his former armed service member status **precludes** MetLife's alleged application of express written provisions of Shell's Armed Services Exclusion in compliance with its alleged duty as an ERISA Claim Fiduciary in effect denying Washington's entitlement to covered benefits otherwise extending under the Plan to a similarly situated nonmilitary employee based solely Washington's service in the armed forces. *__Duffer v. UNITED CONTINENTAL HOLDINGS, INC.,__* 173 F. Supp. 3d 689 (N.D. Ill. 2016) citing *__Roslyn v. Northwest Airlines, Inc__*. No. 05-441, 2005 WL 1529937, at *2 (D.Minn. June 29, 2005).

113. MetLife next claimed since Shell's LTD Plan, including Shell's Armed Services Exclusion, were approved by the required state insurance departments, Shell's Armed Services Exclusion

supersedes Washington's federal right under USERRA not to be denied benefits extending under the LTD Plan based on his service in the armed forces.

114. Shell's Armed Services Exclusion when applied to Washington's claim in effect served to deny Washington's entitlement to covered benefits extending to a similarly situated nonmilitary employee under the Plan based on Washington's service in the armed forces in clear violation of USERRA. Shell's Armed Services Exclusion, allegedly approved by the required state insurance departments,  does not establish an employment right or benefit that is more beneficial than, or is in addition to, a right or benefit provided under USERRA; MetLife application of Shell's Armed Services Exclusion in denying Washington's claim is thus **superseded** by Washington's protected federal right not to be denied *benefits of employment* otherwise extending to a similarly situated nonmilitary employee under the Plan based on Washington's service in the armed forces. **U.S.C. § 4302(b).**

115. The fact USERRA is a federal statute not preempted by ERISA, USERRA precludes laws or policies that diminish rights or protections extended there under establishes, MetLife could make no showing then nor make a showing now its proffered reasons for nonetheless applying Shell's Armed Services Exclusion in violation of USERRA were *not* purely pretextual reasons offered to disguise its willful violations of USERRA. ***Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.,*** 473 F.3d 11, 17  (1st Cir. 2007).

116. That Washington's claim file included medical records establishing Washington's disabling PTSD/depression conditions continuously prevented Washington from performing his regular job or Comparable Occupation throughout the Plan's Elimination Period on through May 1, 2017, Pre Existing Conditions provisions extend covered ***benefits*** to **military** and **nonmilitary** employees alike arising from **any Disability,** not otherwise excluded under Shell's LTD Plan,

caused by, contributed to by or resulting from a Pre-Existing Condition irrespective of the nature of the resultant disabling condition and/or the nature of the underlying Pre-Existing injury, MetLife admits it did not deny or uphold its denial of Washington's claim based on the Shell's LTD Plan Pre Existing Conditions provisions, MetLife can make no showing its action in denying Washington's claim *would* have been taken in the absence of its application of Shell's Armed Services Exclusion or Washington's military service. 38 U.S.C. § 4311(c) (emphasis added). ***Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.,*** 473 F.3d 11, 17  (1st Cir. 2007).

117. Prior to December 5, 2015, Washington's claims level file included a Psychiatric Clinical Specialist (PCS) Assessment performed at MetLife's request dated October 25, 2015 establishing Washington's psychiatric impairments, PTSD/depression conditions continuously prevented Washington from performing his regular job or a Comparable Occupation from October 13, 2014 throughout the Elimination Period and beyond. But for MetLife' wrongful application of the war exclusion at the claim level, MetLife acknowledged Washington's disabling PTSD/depression conditions were otherwise disabling as defined under Shell's LTD Plan as of September 9, 2016.

118. MetLife's wrongful application of the war exclusion in denying Washington's claim for Short Term Disability benefits arising from disabling PTSD/depression conditions from July 1, 2015 through October 13, 2015 notwithstanding, MetLife's wrongful application of the war exclusion in denying Washington's claim for Long Term Disability benefits arising from his disabling PTSD/depression conditions effective October 13, 2015 notwithstanding, medical records made part of Washington's claim file as of December 1, 2016 establish Washington's disabling psychiatric conditions continuously prevented Washington from performing his regular job or Comparable Occupation from October 13, 2014 through October 13, 2015, establish

Washington was disabled, as defined under Shell's LTD Plan, throughout the Plan's Elimination Period.

119. MetLife's wrongful application of Shell's Armed Services Exclusion on September 9, 2016 in denying Washington's claim for Long Term Disability benefits arising from his disabling PTSD/depression conditions effective October 13, 2015 notwithstanding, medical records made part of Washington's claim file as of December 1, 2016 establish Washington's disabling PTSD/depression conditions continuously prevented Washington from performing his regular job or Comparable Occupation from October 13, 2014 through December 1, 2016, establish Washington was Totally Disabled as defined under the Plan and entitled to receive LTD benefits under the Plan from October 13, 2015 through December 1, 2016 and beyond.

120. MetLife's wrongful application of the war exclusion notwithstanding, Washington' was entitled to Short Term Disability benefits under the LTD Plan arising from Washington's disabling PTSD/depression conditions from July 1, 2015 through October 13, 2015, MetLife's application of Shell's Armed Services Exclusion on September 9, 2016 in violation of USERRA protections extending to Washington's claim notwithstanding,  Washington' was entitled to Long Term Disability benefits under the LTD Plan arising from Washington's disabling PTSD/depression condition from October 13, 2015 through December 1, 2016 as of December 1, 20916.

121.Prior to his terminating his employment with the Company effective December 31, 2016, Washington was disabled and entitled to receive benefits under Shell's LTD Plan from October 13, 1014 through October 13, 2015; Washington was Totally Disabled and entitled to receive benefits under Shell's LTD Plan effective October 13, 2015 on through December 1, 2016. As of December 1, 2016 Washington was entitled to receive Disability benefits under Shell's

LTD Plan, Washington's entitlement continues as long as Washington continues to meet the eligibility requirements for Long Term Disability under Shell's LTD Plan.

122. At the date of filing this Complaint, Washington remains Totally Disabled, as defined under the Plan.

## SECOND CAUSE of ACTION FOR
## LIQUIDATED DAMAGES –38 U.S.C. §4323

123. Washington incorporates each of the above paragraphs by reference herein.

124 The Company, an employer for purposes of USERRA, vested MetLife with the power, authority, right to determine all questions concerning eligibility for benefits which determination will be conclusive and binding on all parties. MetLife is considered an **employer** within the meaning of USERRA § 4303(4)(A), 38 U.S.C. § 4303(4)(A).

125. By letter of December 5, 2015, MetLife denied Washington's claim for Short Term benefits arising from disability due to Washington's physical injuries from July 1, 2015 through October 13, 2015 claiming the medical information received and reviewed relative to physical disabling conditions did not support these were disabling past June 30, 2015; MetLife denied Washington's claim for Short Term benefits arising from psychiatric impairments, PTSD/depression, from July 1, 2015 through October 13, 2015 because the psychiatric impairments were war related and thus excluded from establishing the definition of disability throughout the entire elimination period. Washington appealed the denial on April 15, 2016.

126. MetLife's Denial Letter upheld its own initial "claims level denial" of Washington's claim for Short Term benefits from July 1, 2015 through October 1, 2015 arising from disability due to Washington's physical injuries asserting these conditions were not disabling past June 30, 2015; MetLife denied Washington's claim for Short Term disability benefits from July 1, 2015 through October 1, 2015 arising from Washington's disabling PTSD/depression conditions based on the

"plan exclusion for service in the armed forces of any nation, **which was not a basis for the original determination,"** MetLife denied Washington's claim for Long Term disability benefits effective October 13, 2015 arising from Washington's disabling PTSD/depression conditions based on the "plan exclusion for service in the armed forces of any nation, **which was not a basis for the original determination."**

127. A preeminent underwriter of Welfare Benefit Plans and/or Claims Administrator of Long Term Disability Plans established by national and multinational companies, MetLife knew USERRA is a federal statute not preempted by ERISA. See 29 U.S.C. § 1144(d)("<u>Nothing in this</u> <u>[ERISA] subchapter [on the Protection of Employee Benefit Rights] shall be construed to alter,</u> <u>amend, modify, invalidate, impair, or supersede any law of the United States (except as provided</u> <u>in sections [addressing federal laws other than USERRA].. . . "). *Shea v. IRON WORKERS</u>* *<u>DIST. COUNCIL OF NEW ENGLAND</u>*, 158 F. Supp. 3d 20 (D. Mass. 2016);

128. MetLife knew  USERRA's protections "**<u>supersedes any</u> State law (including any local law** **or ordinance), contract, agreement**, policy, plan, practice, or other matter **that reduces, limits,** **or eliminates in any manner any right** or benefit provided by this chapter, **including the** **establishment of additional prerequisites to the exercise of any such right or the receipt of** **any such benefit**." 38 U.S.C. § 4302(b).

129. USERRA's legislative history makes clear Congress intended the definition of "**employer"** [be interpreted broadly] enough to apply to insurance companies [**like MetLife**] that administer employers' life, long-term disability, or health plans, **so that such entities [like MetLife] cannot** **refuse to modify their policies in order for employers to comply with requirements under** **[USERRA].**" S. Rep. No. 158, 103d Cong., 2d Sess. 42 (1993).

130. That Pre-Existing Condition provisions of Shell's LTD Plan extend covered **benefits** to a similarly situated **nonmilitary employee's** claim for benefits arising from Washington's exact same disabling condition, delayed onset of disabling PTSD conditions triggered by material changes in the work environment, deemed to have been be caused by, contributed to or resulting from Pre-Existing Condition, an employer for purposes of USERRA, MetLife knew it could not refuse to use the unfettered power, as an employer for purposes of USERRA, delegated to it by the Company to modify Shell's LTD Plan adopted in order that the Company could comply with its own non-delegable requirements under USERRA.

131. An employer for purposes of USERRA, MetLife knew it bore a statutory obligation to substitute USERRA's substantive protections in place of provisions in Shell's LTD Plan applied in effect to "replace, limit, or eliminate" Washington's protected federal right not to be denied disability benefits extending under Shell's LTD Plan to similarly situated nonmilitary employee based on Washington's performance of service in the armed forces. **_Bodine v. Cook's Pest Control, Inc._** 830 F.3d 1320 (11th Cir. 2016); 38 U.S.C. § 4302(b).

132. MetLife continued its wrongful denial of Washington's claim for benefits upholding its claims level denial premised solely on its application of Shell's Armed Service Exclusion, "which [exclusion] was not a basis for the original determination," with marked careless disregard for whether or not it had the right to do so, failing provide, in response to substantive arguments advanced in six separate letters Washington sent to MetLife during the pendency of the appeal, specific reasons for its adverse determination.

133. MetLife continued its wrongful denial of Washington's claim for benefits upholding its claims level denial premised solely on its application of Shell's Armed Service Exclusion, "which [exclusion] was not a basis for the original determination" ignoring its statutory

obligation to modify Shell's LTD Plan in order that Washington could avail himself of USERRA's protections extending to his claim under the Plan, refusing to use the unfettered power as an employer for purposes of USERRA delegated to it by the Company to modify Shell's LTD Plan adopted in order that the Company, Washington's then employer, could comply with its own non-delegable requirements under USERRA. Washington appealed.

134. Neither of MetLife's assertions advanced in its Second Denial Letter *i.e., "USERRA has no applicability here. The relevant employment benefit here is LTD **coverage;** Mr. Washington received the same LTD **coverage** as other Shell Oil employees. Mr. Washington is not being denied LTD **coverage** under the Plan. All Plan participants, both **armed forces service members** and **non-armed forces service members,** have received the same coverage;"* "Washington was not being denied LTD coverage under the Plan. He does have such coverage. Rather, he is being denied benefits, because the Plan does not provide disability benefits for his claimed disabling conditions," it had "**not denied or upheld the denial** of Mr. Washington's claim based upon the Plan's Pre-Existing condition [provisions] and **has not relied and does not rely in any way upon that Plan provision,**" establish a legitimate reason, standing alone, why MetLife would have denied Washington's claim for benefits absent MetLife's application of Shell's Armed Services Exclusion and/or Washington military status. In fact, the forgoing assertions are little more than explanations of why MetLife applied Shell's Armed Services Exclusion in denying Washington's claim.

135. Finally, tacitly acknowledging USERRA's protections extending to Washington's claim for benefits under the LTD Plan, Pre-Existing Condition provisions of the LTD Plan extending covered benefits to similarly situated non military's employee's notwithstanding, MetLife proffered two pretextual reasons presumably in support of a knowingly false assertion it would

have denied Washington's claim for benefits in spite of its application Shell's Armed Services Exclusion or Washington's military status.

136. That USERRA is a federal statute not preempted by ERISA, USERRA precludes laws or policies that diminish rights or protections extended there under establishes MetLife can make no showing its proffered reasons for nonetheless applying Shell's Armed Services Exclusion are not pretexts offered to disguise willful violations of USERRA. ***Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.,*** 473 F.3d 11, 17  (1st Cir. 2007).

137. Aided by an inherent and structural conflict of interest, MetLife's applied  Shell's Armed Services Exclusion to Washington's claim in effect to reduce, limit or eliminate in willful violation of USERRA Washington's entitlement to covered benefits extending to a similarly situated nonmilitary employees under Shell's LTD Plan based solely on Washington's service in the armed forces in reckless and deliberate indifference to Washington's protected status and its statutory obligations on an "employer."

## THIRD CAUSE of ACTION FOR RECISSION
## PURSUANT TO 38 U.S.C. § 4302(b)

138. Washington incorporates each of the above paragraphs by reference herein.

139. During the pendency of his initial appeal, Washington sent MetLife not less than six separate each providing MetLife written notice that:

1. The provision of the Plan stating "This Plan does not cover any Disability which result from or is caused or contributed by: 1. war, insurrection, or rebellion . . . " had no application to Washington's claim for benefits. History reflects that during the time Washington spent in Afghanistan, there was no properly declared or "perfect" war between the United States and the Afghan Government; reflects the United States military forces were present in Afghanistan by the consent and desire of Afghanistan's properly elected and representative government. War, both declared and undeclared, requires a conflict between two nations. War cannot exist between mere individuals. That a "war' did not exist in any form between Afghanistan and the United States during Mr. Washington's time in Afghanistan from May 2007 through March 2008, any disability alleged to result from or be caused or contributed to by Mr. Washington's time in

Afghanistan from May 2007 through March 2008 would not constitute a disability otherwise excluded under the Plan.

2. Since a war, as the term is used in Shell's LTD Plan, did not exist in any form between Afghanistan and the United States during Washington's time in Afghanistan, any disabling conditions MetLife alleges to result from, be caused or contributed to by Washington's traumatic brain injury sustained while in Afghanistan are not otherwise excluded by the "war" exclusion under the Plan.

3. Even could the "war" exclusion be applied to exclude any disabling condition alleged to result from Washington's traumatic brain injury sustained while in Afghanistan, TBI and PTSD are separate conditions. Washington maintained that since the current manifestation of Washington's disabling condition (PTSD) was proximately caused by job related stress, Washington's acknowledged disabling condition (PTSD) is not otherwise excluded under the "war" exclusion of the Disability Plan.

140. By letter dated September 9, 2016 "(Denial Letter"), MetLife upheld its own initial "claims level denial" of Washington's claim for Short Term benefits from July 1, 2015 through October 1, 2015 arising from disability due to Washington's physical injuries asserting these conditions were not disabling past June 30, 2015; MetLife upheld denial of Washington's claim for Short Term disability benefits from July 1, 2015 through October 1, 2015 arising from Washington's disabling PTSD/depression conditions based on the "plan exclusion for service in the armed forces of any nation, **which was not a basis for the original determination,"** MetLife upheld denial of Washington's claim for Long Term disability benefits effective October 13, 2015 arising from Washington's disabling PTSD/depression conditions based on the "plan exclusion for service in the armed forces of any nation, **which was not a basis for the original determination."**

141. MetLife continued its wrongful denial of Washington's claim for benefits upholding its claims level denial premised solely on its application of Shell's Armed Service Exclusion, "which [exclusion] was not a basis for the original determination," ignoring its statutory obligation to modify Shell's LTD Plan in order that Washington could avail himself of

USERRA's protections extending to his claim under the Plan, refusing to use the unfettered power as an employer for purposes of USERRA delegated to it by the Company to modify Shell's LTD Plan adopted in order that the Company could comply with its own non-delegable requirements under USERRA.

142. On heels of MetLife's adverse determination on September 9, 2016, the Company directed an Agreement to Participate in a Special Severance Plan ("Agreement") to Washington's attention dated October 10, 2016.  The Agreement stated in relevant part:

> After full consideration I represent that I have not filed and agree and promise that I will not file against the Company, its officers, directors, employees, or agents in any local, state or federal court, any lawsuit, of any kind, nature, or character whatever, with respect to any matter pertaining to or arising from my employment or termination of employment with the Company. This waiver, release and promise includes, but is not limited to, any lawsuit with respect to:

> (1) any local, state or federal laws covering discrimination, including those based upon race, sex, color, religion, national origin, citizenship, age (including claims under the Age Discrimination in Employment Act, as amended by the Older Workers Benefit Protection Act), disability status, disabled or Vietnam-era veteran status, sexual orientation, gender identity, or other protected status, alleging discrimination against myself during my employment or because of my termination, . . .

> (4) any local, state or federal laws or equitable claims for torts, including but not limited to intentional or negligent infliction of emotional distress, mental anguish or mental suffering, negligence, defamation, invasion of privacy, fraud and deceit, promissory estoppel or personal injury,

143. USERRA expressly supersedes any substantive contractual terms that reduce, limit, or eliminate the rights afforded by USERRA. 38 U.S.C. § 4302(b).  *See Wysocki v. Int'l Bus. Mach. Corp.,* 607 F.3d 1102, 1107 (6th Cir.2010). The Company's "position [is the Agreement] bars any discrimination or other employment-related claims against Shell, including any claim under USERRA."

144. The House Report relating to 38 U.S.C. § 4302(b) states: "The Committee wishes to stress that rights under chapter 43 belong to the claimant, and he or she may waive those rights, either explicitly or impliedly, through conduct. Because of the remedial purposes of chapter 43, any

waiver must, however, be clear, convincing, specific, unequivocal, and not under duress. **Moreover, only known rights which are already in existence may be waived**." H.R. Rep. No. 103-65 (1994), as reprinted in U.S.C.C.A.N. 2453.

145. Washington acknowledges the while his claim was on appeal and prior to executing the Agreement, he informed both the Company and MetLife that any application of Shell's Armed Services Exclusion in denying Washington's claim caused Washington's disabilities arising from Pre-Existing Conditions to be treated less favorably than a similarly situated non-military employee's disabilities arising from Pre-Existing Condition in violation of USERRA.

146. That the Denial Letter states MetLife's claim determination on appeal is "based in part upon the plan exclusion for service in the armed forces of any nation, **which was not a basis for the original determination,"** the Denial Letter acknowledges MetLife's initial "claims level denial based solely on MetLife's its application of the war exclusion. Nonetheless, the Denial Letter stated "[b]ecause MetLife's claim determination on appeal is based in part upon the plan's exclusion for service in the armed forces of any nation, which was not a basis for the original claim determination we are providing additional appeal rights with respect to those conditions subject to that exclusion as follows; [b]ecause Mr. Washington's claim was denied in whole or in part he may appeal this decision made regarding his psychiatric conditions with regard to the Plan's war **or** service in the armed forces of any nation exclusions by sending a written request for appeal to MetLife."

147. MetLife knew had it in fact upheld its initial "claims level denial" on September 9, 2016 in part based on its application of claim of the war exclusion, Washington would have exhausted his appeal rights with respect to his disabling conditions, PTSD/depression, made subject to the war exclusion at the claims level, knew there would have been no basis to invite Washington to

file another appeal of MetLife's application of the war exclusion, knew any such decision upholding its own "claims level denial" based on its application of the war exclusion would not hold up on judicial appeal.

148. Truth is MetLife knew on or before September 9, 2016 its application of the war exclusion in reaching its initial claims level determination denying Washington's claim for benefits was wrongful, MetLife knew Washington was otherwise entitled to no less than $68,000.00 in benefits from July 1, 2015 through September 9, 2016 as result of its wrongful application of the war exclusion.

149. So as to disguise the foregoing facts, MetLife engaged in a bit of sleight of hand so as to disguise the foregoing facts maintaining its denial of Washington's claim arising from psychiatric disabling conditions was based **in part** on its application of Shell's Armed Service Exclusion, failing provide, in response to Washington's arguments advanced in six separate letters sent to MetLife during the pendency of the appeal, specific reasons for its adverse determination, affording Washington the right appeal its decision made regarding his psychiatric conditions with regard to the <u>Plan's war **or** service in the armed forces of any nation exclusions.</u>

150. MetLife purposefully afforded Washington the right appeal its decision regarding his psychiatric conditions with regard to both the Plan's war **or** service in the armed forces of any nation exclusions creating the inference MetLife's denial of his claim on September 9, 2016 could have been based in part on MetLife's application of the war exclusion, in a willful attempt to obfuscate the existence of USERRA rights arising from its denial, in a willful attempt to mislead Washington into believing MetLife's application of Shell's Armed Services Exclusion wasn't the motivating factor MetLife relied on in reaching its adverse determination.

151. MetLife's chicanery was revealed when in MetLife's Second Denial Letter issued well after Washington executed the Agreement MetLife acknowledged what it knew on September 9, 2016 yet failed to disclose. Specifically, MetLife declared that "in denying Mr. Washington's claim [MetLife] is no longer relying in any way on the Plan's exclusion for disabilities that result from or are caused or contributed to by "war, insurrection, or rebellion ...;" MetLife declared its denial of Washington's claim for benefits on September 9, 2016 was based "[solely] upon the Plan's entirely separate and independent exclusion for disabilities that result from or are caused or contributed to by service in the armed forces of any nation."

152. On September 9, 2016 MetLife applied Shell's Armed Services Exclusion with marked careless disregard for whether or not it had the right to do so, refusing to use its unfettered power delegated to it by the Company, as an employer for purposes of USERRA, to modify Shell's LTD Plan in order that the Company, Washington's then employer, could comply with the Company's non-delegable requirements under USERRA, intentionally ignoring its own statutory obligations owed to substitute USERRA's substantive protections in place of Shell's Armed Services Exclusion that as applied served to "replace, limit, or eliminate" Washington's protected federal right not to be denied disability benefits, otherwise extending under the Plan to similarly situated nonmilitary employee, based on Washington's performance of service in the armed forces, kicking the day of reckoning down the road delaying Washington's entitlement to benefits of which MetLife could offer no basis in fact or law to deny.

153. The Company is an "**employer**" as defined in 38 U.S.C. § 4303(4)(A). Washington was a regular full time **employee** employed by the Company from May 1, 2012 on through December 1, 2016. USERRA defines the term "**employee**" to include the former employees of an **employer.** The Company, an employer for purposes of USERRA, vested MetLife with the

power, authority, right to determine all questions concerning eligibility for benefits which determination will be conclusive and binding on all parties. MetLife is considered an **employer** within the meaning of USERRA § 4303(4)(A), 38 U.S.C. § 4303(4)(A).

154.  Where two entities each exercise certain control over an employee's terms and conditions of employment, such as in the where the Plan Administrator delegates the power, authority, right to determine all questions concerning eligibility for benefits which determination will be conclusive and binding on all parties case of contract employees to a third party, both entities are considered to be the "employer" and share responsibility for compliance under USERRA. 20 CFR §1002.37.

155.  MetLife acknowledges in its Second Denial Letter Washington's military status was the **motivating factor** MetLife conditioned its decision to deny Washington's claim on September 9, 2016, MetLife's denial of benefits based on its application of Schell's Armed Services Exclusion represents an adverse employment action, MetLife failed to advance nor can it make any showing its action that its denial of Washington's claim *would* have been taken in the absence of its application of Shell's Armed Services Exclusion or consideration of Washington's military service. The Company is liable for MetLife's application of Shell's Armed Services Exclusion in violation of USERRA's protections extending to Washington's claim for benefits. ***Staub v. Proctor Hosp.***, 562 U.S. 411 (2011).

156. Restatement (Second) of Agency § 219 (1957) states:

   (1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.

   (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

   (a) the master intended the conduct or the consequences, or

   (b) the master was negligent or reckless, or

(c) the conduct violated a non-delegable duty of the master, or

(d) the servant purported to act or to speak on behalf of the principal and there

was reliance upon apparent authority, or he was aided in accomplishing the tort by

the existence of the agency relation.

157.  Since the Company owed a non-delegable duty not deny any benefit of employment to an employee based upon the employee's status as a former armed forces service member, the Company is liable for MetLife's application of Shell's Armed Services Exclusion in violation of USERRA's protections extending to Washington's claim for benefits whether MetLife's actions were within or outside the scope of the powers the Company delegated to it by the Company.

158. A person however may waive "[o]nly known [USERRA] rights which are already in existence." The Company maintains the Agreement includes a waiver of "any and all [USERRA] causes of action, known or unknown, which arose or could have arisen up to and including the date this Agreement is signed."

159. That MetLife knew any decision upholding its initial "claims level denial" in part based on its application of claim of the war exclusion would have exhausted his appeal rights with respect to his disabling conditions, PTSD/depression, made subject to the war exclusion at the claims level, MetLife knew its application of the war exclusion in reaching its claims level denial Washington's claim was wrongful, MetLife, the Company's agent, afforded Washington the right appeal its decision made regarding his psychiatric conditions with regard to the Plan's war or service in the armed forces of any nation exclusions in a willful attempt to obfuscate the very existence of Washington's USERRA rights arising from its denial. MetLife's Second Denial Letter contains MetLife's acknowledgment Washington's military status was the

**motivating factor** MetLife conditioned its decision to deny Washington's claim on September 9, 2016,

160. To the extent the existence of Washington's USERRA claim based on MetLife's application of Shell's Armed Services Exclusion be determined to arise when MetLife declared its denial of Washington's claim on September 9, 2016 was based "[solely] upon the Plan's entirely separate and independent exclusion for disabilities that result from or are caused or contributed to by service in the armed forces of any nation" on May 1, 2017, Washington's right to bring an action under USERRA against the Company for MetLife's determination reached on May 1, 2017 in violation of USERRA could not have been waived by the Agreement.

161. The term employee includes the former employees of an employer. 20 CFR 1002.5(c.). "The Committee [House Committee on Veterans' Affairs] intended USERRA's antidiscrimination provisions be broadly construed and strictly enforced. The definition of employee, which also includes former employees, would protect those persons who were formerly employed by an employer and who have had adverse action taken against them by the former employer since leaving the former employment." *House Committee Report, April 28, 1993 (H.R. Rep. No. 103-65, Part 1), reprinted in Appendix B-1 of The USERRA Manual by Kathryn Piscitelli and Edward Still. The quoted paragraphs can be found on pages 665-66 of the 2016 edition of the Manual.* **"Only known rights which are already in existence may be waived**." H.R. Rep. No. 103-65 (1994), as reprinted in U.S.C.C.A.N. 2453.

162. Even could it be determined Washington could waive his **known substantive USERRA rights already in existence** through his execution of the Agreement, any waiver must be clear, convincing, specific, unequivocal, and not under duress in exchange for consideration that was more valuable than the USERRA rights he gave up.

163. The Company's "position [is the Agreement] bars any discrimination or other employment-related claims against Shell, including any claim under USERRA." The Company's desire to eliminate Washington's procedural rights to enforce protections of USERRA, thereby eliminate Washington's substantive protections as well was a  principal cause of the Agreement of which the Company would not have otherwise contracted.

164. Aware Washington filed a disability claim with MetLife under Shell's LTD Plan, aware Washington maintained USERRA's protections extended to his claim for benefits, aware its agent MetLife afforded Washington the right appeal its decision regarding his psychiatric conditions with regard to the Plan's war or service in the armed forces of any nation exclusions, the Company knew or should have known Washington would not have otherwise contracted had he known it meant the elimination of Washington's procedural rights to enforce protections of USERRA, thereby eliminating Washington's substantive protections as well. *See* La. Civ. Code art. 1949, Revision Comments—1984, cmts. (b) & (c) (West 2012).

165. The Agreement fails however to identify USERRA by statutory reference and/or by any description as to what it covers and/or to what it applies, fails to unambiguously disclose and/or inform Washington that by signing the Agreement he would be waiving procedural and substantive USERRA rights then extending to him under the Plan.

166. That the Agreement failed to unambiguously disclose and/or inform Washington that by signing the Agreement he would be waiving procedural and substantive USERRA rights then extending to him under the Plan, Washington signed the Agreement in error for he would not have otherwise contracted had he known it meant the elimination of Washington's procedural rights to enforce protections of USERRA, thereby eliminating Washington's substantive protections as well.

167. Had the Company's agent, MetLife, not engaged in the chicanery surrounding its denial of Washington's claim on September 9, 2016, MetLife acknowledged its wrongful application of the war exclusion seven months earlier, provided some specific reasons for its adverse determination seven months earlier in response to Washington's substantive arguments advanced during the pendency of the appeal, MetLife proffered the purely pretextual reasons advanced on May 1, 2017 seven months earlier, Washington would have been in a far better position to reasonably determine if his rights provided in the Agreement were less beneficial than his USERRA rights then advanced.

168. MetLife knew on or before September 9, 2016 Washington's medicals reviewed by MetLife at the claims level supported Washington's claims for psychiatric PTSD /depression conditions, MetLife knew Washington's depression and PTSD conditions were otherwise disabling, MetLife was aware of his emotional state, knew Washington was vulnerable to emotional distress. MetLife knew its application of Shell's Armed Service Exclusion in violation of its USERRA protections extending thereto with marked careless disregard for whether or not it had the right to do so would cause Washington severe financial distress and emotional duress.

169. Continuing to suffer disabling depression/PTSD conditions fully supported by Washington's medical records of appeal, MetLife's failure provide specific reasons for its adverse determination on September 9, 2016 having compromised Washington's ability to reasonably determine if the rights provided in the Agreement were more beneficial than his USERRA rights than advanced, continuing to suffer financial distress and emotional duress MetLife knew and/or intended would result from its intentional actions undertaken at the Company's behest, Washington signed the Agreement not because he believed that the rights provided in the Agreement were more beneficial than his USERRA rights, but rather because of the severe

financial distress and emotional duress he continued to suffer as a proximate result of MetLife's intentional acts.

170. Washington executed the Agreement accepting a $29,739.00 terminating his employment effective December 1, 2016. MetLife knew, before engaging in intentional acts in violation of USERRA's protections extending to Washington's claim at the Company's behest, Washington was entitled to no less than $68,000.00 in benefits under the Plan as of September 9. 2016.

171. The Company claims the Agreement bars any discrimination or other employment-related claims against Shell, including any claim under USERRA, the Company claims Washington's claims against MetLife under USERRA are unaffected by the Agreement. The intended beneficiary of MetLife's willful acts could not be clearer.

172. By the time December 1, 2016 rolled around, Washington signed the Agreement not because he believed that the rights provided in the Agreement were more beneficial than his USERRA rights, but rather because of the severe financial distress and emotional duress he continued to suffer as a proximate result of the Company and its designee's actions, Washington is entitled to and seeks to rescind portions of the Agreement pursuant to 38 U.S.C. § 4302(b).

### FOURTH CAUSE of ACTION FOR
### LIQUIDATED DAMAGES –38 U.S.C. §4323

173. Washington incorporates each of the above paragraphs by reference herein.

174. The Company, an employer for purposes of USERRA, vested MetLife with the power, authority, right to determine all questions concerning eligibility for benefits which determination will be conclusive and binding on all parties.

175. MetLife is considered an **employer** within the meaning of USERRA § 4303(4)(A), 38 U.S.C. § 4303(4)(A).

176. The fact that all administrative functions of Shell's LTD Plan were delegated to MetLife did not/does not absolve the Company of its duty to review and insure MetLife acted in the best interests of participants of Shell's LTD Plan and/or in the best interests of its employees. It is simply impossible for the Company to prudently determine whether t retain, remove, or replace the designee, if they fail to properly monitor the designee's performance.

177. The duty to monitor carries with it, of course, the duty to take action upon discovery that the appointed designee is not performing properly.

178. Absent the Company's continuing duty to monitor its designee's actions, continuing duty to take action upon discovery that the appointed designee is not performing properly, MetLife would have free reign to administer Shell's LTD Plan as it pleased, free reign to offer specious explanations at the claims level and the appeals level in support of a claims denial without fear of reprisal or rebuke.

179. The Company's duty not deny any benefit of employment to an employee based upon the employee's status as a former armed forces service member gave rise to an independent and even greater duty to monitor MetLife's unfettered power delegated to it in order to assure itself MetLife administered Shell's LTD Plan in order that the Company could comply with its own non-delegable requirements under USERR; gave rise to a correlative duty, upon discovering the appointed designee is not performing properly, to take corrective action.

180. Washington put the Company notice of MetLife's potential violation of USERRA during the pendency of his initial appeal. The Company having responded stating the *"letter ha[d] been forwarded internally to the Plan Administrator of Shell's Long Term Disability program, and you will receive a response once the matter has been fully reviewed and evaluated."*

181. The Company knew or should have know MetLife upheld its denial of Washington's claim

for LTD benefits on September 9, 2016 applying Shell's Armed Service Exclusion ignoring its statutory obligation to modify Shell's LTD Plan in order that Washington could avail himself of USERRA's protections extending to his claim under the Plan, **refusing to use the unfettered power, as an employer for purposes of USERRA, delegated to it by the Company to modify Shell's LTD Plan adopted in order that the Company, Washington's then employer, could comply with its requirements under USERRA.**

182. In addition to its non-delegable duty not deny an employee benefits of employment based on their military status, the Company owed an independent duty to monitor MetLife's unfettered power delegated to assure itself MetLife's administered Shell's LTD Plan in order that the Company could comply with its non delegable requirements under USERRA.

183. The Company knew of and/or acted in reckless disregard for MetLife's failure to comply with its statutory obligation to modify Shell's LTD Plan in order that Washington could avail himself of USERRA's protections extending to his claim under the Plan, knew and/or acted in reckless disregard for MetLife's refusal to use the unfettered power delegated to it by the Company to modify Shell's LTD Plan adopted in order that it, Washington's then employer, could comply with its own non-delegable requirements under USERRA.

184. The Company instead sought to take advantage of MetLife's wrongful denial of benefits. On the heels of MetLife's application of Shell's Armed Service Exclusion in denying Washington's claim for benefits in violation of USERRA's protections extending thereto, the Company sent Washington an Agreement to Participate in a Special Severance Plan ("Agreement") in a surreptitious effort to absolve itself of any liability under USERRA.

185. The Company's undisclosed intent to eliminate all of Washington's procedural rights to enforce protections of USERRA, thereby eliminate Washington's substantive protections as well,

a principal cause of the Agreement of which the Company allegedly would not have otherwise contracted, **is not clearly or unambiguously disclosed in the Agreement.** The Agreement fails to identify USERRA by statutory reference and/or by any description, fails to unambiguously inform Washington that by signing the Agreement he would be waiving procedural and substantive USERRA rights then extending to him under the Plan.

186. In reckless and deliberate indifference to Washington's protected status and its own statutory obligations on an "employer," the Company surreptitiously sought to reduce, limit, or eliminate, Washington's entitlement to a benefit of employment in violation of USERRA through Washington's execution of the Agreement.

### FIFTH CAUSE of ACTION FOR
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

187. Washington incorporates each of the above paragraphs by reference herein.

188. Prior to December 5, 2015, Washington's claims level file included a Psychiatric Clinical Specialist (PCS) Assessment performed at MetLife's request dated October 25, 2015 establishing Washington's psychiatric impairments, PTSD/depression conditions continuously prevented Washington from performing his regular job or a Comparable Occupation from October 13, 2014 throughout the Elimination Period and beyond.

189  By letter dated September 9, 2016 MetLife nonetheless upheld denial of Washington's claim for Short Term disability benefits from July 1, 2015 through October 1, 2015 arising from Washington's disabling PTSD/depression conditions based on the "plan exclusion for service in the armed forces of any nation, **which was not a basis for the original determination,"** upheld denial of Washington's claim for Long Term disability benefits arising from Washington's disabling PTSD/depression conditions effective October 13, 2015 based on the "plan exclusion

for service in the armed forces of any nation, **which was not a basis for the original determination."**

190. The  Denial Letter states MetLife's claim determination on appeal is "based in part upon the plan exclusion for service in the armed forces of any nation, **which was not a basis for the original determination,"** MetLife' initial "claims level denial of Washington's claim for Short Term benefits from July 1, 2015 through October 1, 2015, denial of Washington's claim for Long Term benefits effective October 13, 2015 rested solely on its application of the war exclusion.

191. MetLife's Denial Letter stated "[b]ecause MetLife's claim determination on appeal is based in part upon the plan's exclusion for service in the armed forces of any nation, which was not a basis for the original claim determination we are providing additional appeal rights with respect to those conditions subject to that exclusion as follows; [b]ecause Mr. Washington's claim was denied in whole or in part he may appeal this decision made regarding his psychiatric conditions with regard to the Plan's **war or service in the armed forces of any nation exclusions** by sending a written request for appeal to MetLife."

192. MetLife knew full well its initial "claims level denial of Washington's claim for Short Term benefits from July 1, 2015 through October 1, 2015, Long Term benefits effective October 13, 2015 rested solely on its application of the war exclusion, knew any decision upholding its denial Washington's claim for disabling PTSD/depression conditions based on its application of the war exclusion would have exhausted Washington's appeal rights with respect to those conditions, knew full well any decision upholding its own "claims level denial" based on its application of the war exclusion would not hold up on judicial appeal.

193. MetLife employed a bit of sleight of hand by purportedly affording Washington the right appeal its decision made regarding his psychiatric conditions with regard to the Plan's war or

service in the armed forces of any nation exclusions by sending a written request for appeal to MetLife.

194. MetLife's trickery was confirmed several months later when the Second Denial Letter states **"[p]lease note that MetLife in denying Mr. Washington's claim is no longer relying in any way on the Plan's exclusion for disabilities that result from or are caused or contributed to by "war, insurrection, or rebellion ...."**

195. By letter dated December 5, 2015, MetLife acknowledged medicals reviewed at the claims level supported Washington's claims for psychiatric PTSD/depression conditions, acknowledged Washington's depression and PTSD conditions were in fact disabling but that they were war related as most or all of your trauma relates to past deployments during OEF while in service in the armed forces.

196. On or before September 9, 2016, MetLife knew in fact but did not disclose its application of the war exclusion in denying Washington's claim for benefits through September 9, 2016 was wrongful, knew in fact but did not disclose Washington was entitled to no less than $68,000.00 in benefits arising from July 1, 2015 through September 9. 2016 as result of its wrongful application of the war exclusion. Despite that fact, MetLife repeatedly engaged in extreme and outrageous conduct with the aim of causing Washington to drop his claim and/or to assist the Company in forcing Washington to accept a much smaller severance package upon terminating his employment with the Company.

197. MetLife continued its wrongful denial of Washington's claim for benefits upholding its claims level denial premised solely on its application of Shell's Armed Service Exclusion, intentionally failing provide, in response to substantive arguments advanced in six separate letters Washington sent to MetLife during the pendency of the appeal, specific reasons for its

adverse determination, ignoring its statutory obligation to modify Shell's LTD Plan in order that Washington could avail himself of USERRA's protections extending to his claim under the Plan, refusing to use the unfettered power as an employer for purposes of USERRA delegated to it by the Company to modify Shell's LTD Plan adopted in order that the Company, Washington's then employer, could comply with its own non-delegable requirements under USERRA. Washington appealed.

198. On September 9, 2016, MetLife knew but did not disclose Washington was otherwise entitled to no less than $68,000.00 in benefits arising from July 1, 2015 through September 9. 2016 as result of its wrongful application of the war exclusion, knew there was no legitimate dispute as to Washington's entitlement to benefits under the Plan, knew it was and would be liable for the full amount ultimately determined due Washington under Shell's LTD Plan, knew USERRA's protections extended to Washington's claim, knew it could offer no basis in fact or law to deny Washington's claim for benefits based on its application of Shell's Armed Services Exclusion.

199. No mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities here. MetLife engaged in extreme and outrageous conduct, at the behest of its principal, continuing its denial of Washington's claim with marked careless disregard for whether or not it had the right to do so, refusing to use its unfettered power delegated to it as an employer for purposes of USERRA to modify Shell's LTD Plan in order that the Company, Washington's then employer, could comply with the Company's non-delegable requirements under USERRA, intentionally ignoring its own statutory obligations owed to substitute USERRA's substantive protections in place of Shell's Armed Services Exclusion that as applied served to "replace, limit, or eliminate" Washington's protected federal right not to be denied disability benefits, otherwise

extending under the Plan to similarly situated nonmilitary employee, based on Washington's performance of service in the armed forces, kicking the day of reckoning down the road delaying Washington's entitlement to benefits of which MetLife could offer no basis in fact or law to deny with the intent to inflict severe emotional distress and/or the knowledge severe emotional distress would be certain or substantially certain to result from the conduct all in an effort to assist the Company in forcing Washington to accept a much smaller severance package upon terminating his employment with the Company. ***White v. Monsanto***, 585 So. 2d 1205, 1209 (La. 1991)).

200. MetLife knew on or before September 9, 2016 Washington's medicals reviewed by MetLife at the claims level supported Washington's claims for psychiatric PTSD /depression conditions, MetLife knew Washington's depression and PTSD conditions were otherwise disabling, MetLife was aware of his emotional state, knew Washington was vulnerable to emotional distress. MetLife's intentional acts of ignoring its statutory obligation as an employer for purposes of USERRA to modify Shell's LTD Plan in order that Washington could avail himself of USERRA's protections extending to his claim under the Plan, kicking the day of reckoning down the road thereby delaying Washington's receipt to benefits of which MetLife could offer no basis in fact or law to deny all at the Company's behest caused Washington suffered severe emotional and financial distress as a direct and proximate result thereof.

201. On the heels of MetLife's intentional acts undertaken all at the Company's behest in continuing its wrongful denial of Washington's claim for benefits in violation of USERRA, kicking the day of reckoning down the road thereby delaying Washington's receipt to benefits of which MetLife could offer no basis in fact or law to deny, the Company directed an Agreement to Washington's attention purportedly including language absolving the Company from any liability under USERRA upon Washington's execution of same.

202. As of December 1, 2016, MetLife's absolute failure provide specific reasons for its adverse determination reached on September 9, 2016 compromised Washington's ability to reasonably determine if the rights provided in the Agreement were more beneficial than his USERRA rights then advanced. Had MetLife offered the two purely pretextual reasons proffered on May 1, 2017 for its adverse determination September 9, 2016 seven months earlier, Washington could/would have been better able to determine if in fact his rights provided in the Agreement were less beneficial than his USERRA rights then advanced.

203. Continuing to suffer disabling depression/PTSD conditions fully supported by Washington's medical records of appeal, MetLife's failure provide specific reasons for its adverse determination on September 9, 2016 having compromised Washington's ability to reasonably determine if the rights provided in the Agreement were more beneficial than his USERRA rights than advanced, continuing to suffer severe emotional distress, financial duress MetLife knew and/or intended would result from its intentional actions undertaken at the Company's behest, Washington signed the Agreement not because he believed that the rights provided in the Agreement were more beneficial than his USERRA rights, but rather because of the severe financial distress and emotional duress he continued to suffer as a proximate result of MetLife's intentional acts.

204. As direct and proximate result of MetLife's intentional acts ostensibly undertaken on the Company's behalf, Washington has been injured and damaged in an amount to be determined according to proof at trial.

205. Aware Washington's purchased coverage under Shell's LTD Policy through the Company, his then employer, aware Shell's LTD Policy was perhaps subject to regulation under ERISA, MetLife perceived that by claiming it is an ERISA Claim Fiduciary it could insulate itself from

the panoply of traditional state law claims Washington would otherwise have available to redress MetLife's extreme and outrageous conduct.

206. Because ERISA preemption "supplant[s] a variety of state law causes of action for the wrongful denial of benefits, including claims for tortuous breach of contract, breach of fiduciary duty, and fraud in the inducement, MetLife played what it believed to be a get out of jail card for its oppressive and intentional acts.

207. Washington's state-law claim for intentional infliction of emotional distress could be completely preempted only if at some point in time Washington could have brought the claim under ERISA Section 502(a)(1)(B), and no other independent legal duty is implicated by a MetLife's action. *Aetna Health Inc. v. Davila,* 542 U.S. 200, 210 (2004). Such is not the case.

208. MetLife posits its denial of Washington's claim is based solely on its application of express written provisions of Shell's Armed Services Exclusion. Absent USERRA's protections extending to Washington's claim for benefits under the Plan, MetLife's duties as an employer for purposes of USERRA, Shell's Armed Services Exclusion may well be a basis upon which to deny Washington's claim under the Plan. Thus does not allege nor could it allege a claim seeking "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan" pursuant to ERISA Section 29 U.S.C. §§ 1132(a)(1)-(4).

209. Washington's claim for intentional infliction of emotional distress arises from a legal duty independent of ERISA. Washington has a right, independent of any rights he may have under ERISA, to be free from MetLife's oppressive and intentional actions while acting as an employer for purposes of USERRA in failing, at the Company's behest, to adhere to its a statutory

obligations under USERRA in order to assist the Company in forcing Washington to accept a much smaller severance package terminating his employment with the Company.

210. That Washington's cause for intentional infliction of emotional distress (IIED) could not have been brought under ERISA Section 502(a)(1)(B), Washington's claim for intentional infliction of emotional distress arises from and/or relies on a legal duty independent of ERISA, Washington's cause for IIED against MetLife is not completely preempted by ERISA.

211.  Washington's IIED claim is not based on any state law that seeks to mandate the structure or content of the ERISA plan or how it is administered; Washington's claim for IIED relief does not rely on any state law that dictates "the terms of a plan or the type of benefits a plan may provide," imposes "reporting, disclosure or funding requirements," or "affect[s] calculation of benefits;" Washington's IIED claim is not based on any state law that would bind the plan administrator to particular choices with respect to the plan or that would preclude uniform administrative practices.

213.  While Shell's Armed Services Exclusion may be a basis upon which to deny Washington's claim under the Plan, the determination as to whether or not MetLife's failure, as an employer for purposes of USERRA, to adhere to its duty not to deny any benefit of employment to an employee based upon the employee's status as a former armed forces service member, to adhere to its statutory duty to substitute USERRA's substantive protections in place of Shell's Armed Services Exclusion that as applied served to "replace, limit, or eliminate" Washington's protected federal right not to be denied disability benefits otherwise extending under the Plan to similarly situated nonmilitary employee based on Washington's performance of service in the armed forces was intentionally tortious does not require interpretation of the Plan.

214. Acting as an employer for purposes of USERRA, MetLife knew it could not refuse to use its unfettered power delegated to it by the Company to modify Shell's LTD Plan in order that the Company could comply with the Company's own non-delegable requirements under USERRA, knew it could not refuse to substitute USERRA's substantive protections in place of Shell's Armed Services Exclusion that as applied served to "replace, limit, or eliminate" Washington's protected federal right not to be denied disability benefits based on his performance of service in the armed forces.

215. MetLife was not performing a ERISA Claims fiduciary function when at the Company's behest it continued its wrongful denial of Washington's claim refusing to use its unfettered power delegated to it as an employer for purposes of USERRA, to modify Shell's LTD Plan in order that the Company could comply with the Company's non-delegable requirements under USERRA, intentionally ignoring its own statutory obligations owed to substitute USERRA's substantive protections in place of Shell's Armed Services Exclusion that as applied served to "replace, limit, or eliminate" Washington's protected federal right not to be denied disability benefits, otherwise extending under the Plan to similarly situated nonmilitary employee, based on Washington's performance of service in the armed forces, kicking the day of reckoning down the road delaying Washington's entitlement to benefits of which MetLife could offer no basis in fact or law to deny, to assist the Company in forcing Washington to accept a much smaller severance package upon terminating his employment with the Company.

216. Washington's IIED is not an attempt to enforce his rights under ERISA or under the  ERISA plan, therefore Washington's IIED claim is not an alternative enforcement mechanism to §502, Washington's IIED  claim is thus not related to an ERISA plan under § 514. Washington's lIED

claim is not preempted under § 514. ***Darcangelo v. Verizon Communications Inc.,*** 292 F.3d 181 (4th Cir. 2002).

217. E-Discovery should reveal MetLife consistently employs this same "tag team" approach of wrongfully denying, at the participant's employer's behest, a participants claim for benefits otherwise due under the Plan thereby extending the appeal process thus delaying the participant's receipt of benefits of which MetLife can offer no basis in fact or law to deny solely to assist the employer in forcing an employee to accept a much smaller severance package terminating his employment.

218. Could Washington's cause for IIED arising from MetLife's intentional failure, undertaken at the Company's behest, to adhere to its statutory duties imposed by USERRA in order to assist the Company in forcing Washington to accept a much smaller severance package terminating his employment with the Company be deemed  preempted by ERISA, MetLife will have discovered a sweet spot to engage intentionally tortious conduct arising from its statutory obligation under USERRA with impunity.

219. Some Federal courts have interpreted § 4302(a) to mean that "Congress did not intend to replace any common law remedy that might also be available to plaintiff." ***Hamovitz v. Santa Barbara Applied Research, Inc.,*** No. 07-cv-00454-TFM, 2010 WL 4117270, at *7 (W.D. Pa. Oct. 19, 2010) (quoting ***Slater v. Verizon Communications, Inc.,*** No. 04-cv-00303-SM, 2005 WL 488676, at *4 (D.N.H.2005)) (internal quotation mark omitted); see Reyes v. Goya of Puerto Rico, Inc., 632 F.Supp.2d 142, 145 (D.P.R.2009) (noting that "nothing in the statutory language suggests that state tort law causes of action are pre-empted by USERRA"). Other federal courts have interpreted USERRA to mean it does not provide for the recovery of damages for mental

anguish, pain, or suffering. ***Vander Wal v. Sykes Enters.,*** 377 F.Supp. 2d 738, 745 (D.N.D. 2005),

220. USERRA's legislative history however simply does not establish that Congress intended it to be a veteran's exclusive means to combat discrimination based on military status. See ***Medtronic, Inc. v. Lohr,*** 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (noting that "'the purpose of Congress is the ultimate touchstone' in every pre-emption case") (quoting ***Cipollone v. Liggett Group, Inc.,*** 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)).

221. USERRA provides that "[n]othing in this chapter shall supersede, nullify or diminish any Federal or State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that establishes a right or benefit that is more beneficial to, or is in addition to, a right or benefit provided for such person in this chapter." 38 U.S.C. § 4302(a).

222.  Sections 4302(a) suggests that because USERRA recognizes that state governments may provide greater or additional rights or benefits to veterans, USERRA favors rather than restricts a plaintiff's ability to bring state law claims to redress any harm.

223. As a matter of law, MetLife may not assert the defense that Washington's  state law claims are preempted by USERRA. ***Kane v. Town of Sandwich***, 123 F. Supp. 3d 147, 160 (D. Mass. 2015).

## DEMAND FOR JURY TRIAL

Washington requests a jury trial as is permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE,** as a result of Defendants Shell Oil Company (the "Company") and Metropolitan Life Insurance Company ("Met Life") joint violations of the Uniformed Services Employment Reemployment Act ("USERRA"), Gregory Washington ("Washington") requests

this Court use its full equity powers to vindicate Washington's rights or benefits fully under USERRA in granting the following relief as against Defendants the Company and Met Life:

(a) This Court enter an order estopping the Company and/or MetLife from applying Shell LTD Plan exclusion ["This Plan does not cover any Disability which results from or is caused or contributed to by:. . . 5. **service in the armed forces of any nation**"], to Washington's claim for benefits thereby restricting, limiting, eliminating Washington's protected federal right not to be denied disability benefits otherwise extending under Shell's LTD Plan to a similarly situated nonmilitary employee arising from the exact same disabling conditions Washington complains, delayed onset of PTSD triggered by material changes in the work environment, deemed caused by, contributed to or resulting. from a non service related Pre-Existing Condition irrespective of the nature of the underlying Pre-Existing injury and/or the resultant disabling condition, based on Washington's service in the armed forces;

(b.) This Court enter an order requiring the Company and/or MetLife compensate Washington by a paying an amount of damages equivalent to the dollar amount of "benefits of employment" to which Washington was entitled but did not receive by reason of MetLife and/or the Company's application of Shell's Armed Services Exclusion in denying Washington's claim for "benefits of employment" under the LTD Plan from July 1, 2015 on through May 1, 2017 in violation of USERRA's protections extending thereto;

(c.) This Court enter an order requiring the Company and MetLife each to compensate Washington by both the Company and MetLife paying liquidated damages for their individual actions alleged herein in willful violation of USERRA's protections extending to Washington's claim for benefits of employment under Shell's LTD Plan, the Company and MetLife each to compensate Washington by both the Company and MetLife paying liquidated damages for their

individual actions alleged herein in reckless and deliberate indifference to the Company's and MetLife's statutory obligations as  an "employer" and Washington's protected status in an amount equivalent to the dollar amount of "benefits of employment" to which Washington was entitled but did not receive by reason of MetLife and the Company's application of Shell's Armed Services Exclusion in denying Washington's claim for "benefits of employment" in willful violation of USERRA's protections extending thereto;

(d.) This Court enter an order rescinding any substantive contractual terms of the Agreement that reduce, limit, or eliminate Washington's rights afforded by USERRA, rescinding any substantive contractual terms of the Agreement that reduce, limit, or eliminate the rights afforded by USERRA based on Washington's error and/or Washington's emotional and financial duress as alleged herein, as there can be no finding, as a matter of law, a waiver of  USERRA rights was clear, convincing, specific, unequivocal and in exchange for consideration that was more valuable than the USERRA rights Washington purportedly gave up, an order rescinding any substantive contractual terms of the Agreement that reduce, limit, or eliminate the rights afforded by USERRA;

(e.) This Court enter an order for general damages against MetLife for the emotional distress caused by its intentional acts in an amount to be determined at the time of trial;  special damages in an amount according to proof at trial;  exemplary damages in an amount according to proof at trial;

(f.) The Court order MetLife and/or the Company to pay Washington damages in the amount of disability benefits lost, liquidated damages and any other equitable relief as may be necessary to vindicate fully the rights and benefits to which Washington is entitled under

USERRA including attorney's fees, prejudgment interest, litigation expenses, and post-judgment interest pursuant to 38 U.S.C. § 4323;

(g.) Any other relief as this Honorable Court deems just and appropriate.

**RESPECTFULLY SUBMITTED**:

By: /s/ Jerome J. Pellerin
JEROME J. PELLERIN, ESQ. (17739)
9024 BELFAST STREET
NEW ORLEANS, LOUISIANA 70118
504.261.5839 (office) 504.322.3285(fax)
ATTORNEY FOR GREGORY WASHINGTON